UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Ronald J. Johnson,

              Plaintiff,

   vs.                          REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

           Defendant.       Civ. No. 05-2532 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which partially denied his application for Disability Insurance Benefits

("DIB").  The matter is now before the Court upon the parties' cross-Motions for

Summary Judgment.  The Plaintiff has appeared by Edward C. Olson, Esq., and the

Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For

reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff applied for DIB on July 15, 2002, at which time, he alleged that he had become disabled on March 31, 2002. [T. 92-94, 117-130]. His claims were denied upon initial review, and upon reconsideration. [T. 34-36, 48-56]. The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on September 25, 2003, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel.[1]  [T. 57-69, 302-36]. Thereafter, on December 24, 2003, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 37-47]. The Plaintiff requested an Administrative Review before the Appeals Council which, on April 27, 2004, granted the claim for review, vacated the Hearing Decision, and remanded the case to the ALJ. [T. 13-14, 77-80]. On January 28, 2005, the ALJ issued a partially favorable decision. [T. 13-24]. Thus, the ALJ's determination became the final decision of the Commissioner. Grissom v. Barnhart, 416 F.3d 834,

---

[1]The Record before us does not contain a transcript of the Hearing on September 25, 2003, but neither party has objected to its absence, and therefore, any objection has been waived. As a result, we consider the Record presented as having been fully developed.

836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v.

Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

### III.   Administrative Record

A.    Factual Background.  At the time of the ALJ's decision, the Plaintiff was

forty-seven (47) years old, he had obtained his G.E.D., and had prior work experience

as a tape making machine operator, which is a semi-skilled job that was performed at

the light exertional level.  [T. 13, 171-72].  The Plaintiff alleges that he cannot work due

to his obesity, chronic low back pain, and numbness in his legs.  [T. 13].

The Plaintiff last worked in May of 2002, as a tape cutting machine operator at

3M, where he worked from March of 1979, through May of 2002.  [T. 15].  In January

of 2001, the Plaintiff saw his physician, Dr. Bruce H. Leppink, for a complaint of

cough and cold.  [T. 256].  Later in January of 2001, the Plaintiff saw Dr. Alexander

N. Worobel at the request of Dr. Leppink.  [T.  256, 261-62].  The Plaintiff

complained of pain in both great toenails.  [T. 262].  Dr. Worobel noted that the

Plaintiff's toenails were thick and ingrown, and he advised the Plaintiff that the toenails

had to be removed, which they were.  [T. 261-62].

In May of 2001, the Plaintiff met with Dr. Leppink complaining of low back

pain, that was chronic in nature, but was exacerbated by a fall in his hot tub.  [T. 251,

253].  Dr. Leppink noted that the Plaintiff was "recovering nicely," and he advised him to return to work in a week's time.  [T. 251].  The Plaintiff asked for a medical leave form.  Id.  In June of 2001, the Plaintiff again reported acute low back pain that had started in October of 1997, but was subject to "intermittent exacerbation."  [T. 259-60].  At that time, Dr. Leppink noted that the Plaintiff sometimes required up to five (5) days of medical leave a month due to his low back pain.  [T. 259].  Except for missing work, however, the Record shows that Dr. Leppink believed that the Plaintiff remained capable of performing the essential duties of his job.  Id.

Also in June of 2001, Dr. Leppink treated the Plaintiff for cold and cough symptoms.  [T. 250].  In December of 2001, the Plaintiff called Dr. Leppink to explain that his back "went out while he was getting out of the shower."  [T. 248].  In his subsequent examination of the Plaintiff's back, Dr. Leppink found no new symptoms, "just problems that he has had in the past."  [T. 247].  Dr. Leppink concluded that the Plaintiff had some tenderness in the low back and a little bit of pain up in the thoracic back, which was "mostly resolved."  Id.  The Plaintiff had limited range of motion, and was able "to get up and off the table but with some discomfort."  Id.  Dr. Leppink felt that the Plaintiff might need one (1) or two (2) days of light duty to fully recover before he returned to his regular work.  [T. 247].

- 4 -

In February of 2002, the Plaintiff returned to Dr. Leppink with complaints of right arm pain.  [T. 243].  He had elbow pain that radiated to his wrist, and subsequently developed weakness in his arm.  Id.  However, the Plaintiff did not report experiencing any numbness or tingling in either arm.  Id.  On examination, the Plaintiff had a full range of motion, and negative Tinel's and Phalen's tests.  Id.  Dr. Leppink recommended a reduction in right hand activities for a couple of weeks, and recommended Ibupofen and stretching exercises.  Id.  In addition, Dr. Leppink restricted the Plaintiff's lifting to ten pounds or less until mid-March of 2002.  [T. 242].  After that, the Plaintiff could return to work without restrictions.  [T. 187, 242].

In May of 2002, the Plaintiff injured his groin area while lifting a piece of equipment at work.  [T. 257].  Later that month, Dr. Leppink noted that the Plaintiff had a possible hernia, and that his right elbow pain was ongoing.  [T. 240].  In July of 2002, the Plaintiff visited Dr. Leppink for a variety of issues, and explained that he had been laid off and was pursuing a disability claim.  [T. 239].  Dr. Leppink noted that he felt the Plaintiff was "probably a reasonable candidate" for disability, and that, "considering the amount of disability time that he has related to his back injury," the likelihood of him finding employment was low.  [T. 239].

In September of 2002, Dr. Gregory H. Salmi reviewed the Plaintiff's records for the State Agency.  [T. 264-71].  Dr. Salmi explained that the Plaintiff's work-related abilities were reduced due to chronic low back pain, which were exacerbated by his morbid obesity of 425 pounds.  [T. 265].  In fact, Dr. Salmi noted that the Plaintiff's weight "seems to be the main factor" in his restrictions.  [T. 269.]  However, Dr. Salmi concluded that the Plaintiff retained the ability to work at the sedentary exertional level.  [T. 266].

In October of 2002, Dr. Leppink treated the Plaintiff for bronchitis-type symptoms.  [T. 235].  Later in October of 2002, Dr. Leppink performed a physical examination of the Plaintiff.  [T. 236].  Except for some wheezing and on-going morbid obesity, Dr. Leppink found that the Plaintiff's physical condition was essentially normal.  Id.  In November of 2002, Dr. Leppink reported that the Plaintiff had mild diabetes.  [T. 233].  During the same visit, Dr. Leppink and the Plaintiff also discussed the possibility of gastric bypass surgery for morbid obesity.  Id.

In December of 2002, Dr. Dan Larson reviewed the Plaintiff's records for the State Agency, and affirmed Dr. Salmi's opinion that, notwithstanding his back pain and morbid obesity, the Plaintiff remained capable of working at the sedentary exertional level.  [T. 271].

In July of 2003, the Plaintiff saw Dr. Jeanne M. Anderson, M.D., who is associated with Dr. Leppink, for a six-week history of a rash on his right groin and a four-day history of a right wrist rash. [T. 277]. In addition to the rash, Dr. Anderson listed diagnoses of diabetes, obesity, and chronic pain. [T. 277]. She treated the Plaintiff with medication. Id. Later that month, the Plaintiff returned to Dr. Leppink to discuss the positive results of tests that he had undergone for diabetes. [T. 276]. Dr. Leppink was also concerned about the Plaintiff's hypertension. Id. Dr. Leppink noted that the Plaintiff was physically "deconditioned" because, as soon as he stopped working, he stopped doing any activity at all. Id. Dr. Leppink expressed the opinion that this inactivity was due, at least partly, to the Plaintiff's belief that he was disabled, and therefore, was "unable to do any activity." Id. Dr. Lippink noted that, during that examination, the Plaintiff moved with stiffness because of his "chronic back problem." [T. 276]. In August of 2003, the Plaintiff reported that his groin rash was not resolved, and he had a left armpit rash. [T. 274]. He was given a topical cream. Id.

In September of 2003, the Plaintiff returned to Dr. Leppink for an evaluation of his chronic low back pain. [T. 293]. Dr. Leppink noted that the Plaintiff had a "long documented history of low back pain and disabled ability to work." Id. The Plaintiff complained that, since leaving his job in May of 2003, he had more problems with leg

numbness, along with an occasional burning sensation.  Id.  He reported that he

needed to move about because, when he stopped or sat too long, his leg went numb.

Id.  Dr. Leppink recorded that the Plaintiff's weight was a significant disabling factor.

Id.  On examination, Dr. Leppink found that the Plaintiff lacked deep tendon reflexes

in both legs and ankles.  [T. 292].  Dr. Leppink explained that, even if the Plaintiff

returned to work, he would need a job that allowed him to miss five (5) or more days

a month, and he concluded that the Plaintiff could not work more than four (4) hours

a day.  Id.  Dr. Leppink reported, on the examination form, that, at the time of that

visit, he found the Plaintiff "marginally disabled."  Id.

At the same time, Dr. Leppink completed a disability request form that related

to the Plaintiff's ability to perform work-related activities.  [T. 284-87].  He concluded

that the Plaintiff could lift ten (10) pounds occasionally, and less than ten (10) pounds

frequently.  [T. 284].  He could stand and walk less than two (2) hours in a workday,

and sit for about three (3) hours a day.  Id.  In addition, the Plaintiff needed a job that

included a sit/stand option.  Id.  Dr. Leppink felt that the Plaintiff should do very little

stooping or crouching, could occasionally twist or climb stairs, but should never climb

ladders.  [T. 285].  According to Dr. Leppink, the Plaintiff's low back pain affected

his ability to reach and to push/pull. [T. 268].  The Plaintiff should also avoid working

conditions involving wetness or humidity.  Id.   Dr. Leppink stated that, in the Plaintiff's prior work, he missed about five (5) days of work a month due to his condition.  [T. 287].  Dr. Leppink felt that the Plaintiff's condition had not improved since that time.  Id.

In October of 2003, the Plaintiff saw Dr. John Nichols, who is also associated in Dr. Leppink's medical practice.  [T. 291].  The Plaintiff complained of chest tightness, which was possibly related to pneumonia, and Dr. Nichols treated him with medication.  Id.

In April of 2004, the Plaintiff returned to Dr. Leppink on a follow-up visit for diabetes.  [T. 290].  His diabetes was relatively stabile, although he also complained of continuing chronic low back pain.  Id.  The Plaintiff was treated for cough and congestion in May of 2004.   [T. 289].   Dr. Leppink increased the Plaintiff's medications, for his chronic low back pain, in August of 2004.  Id.  In October of 2004, Dr. Leppink wrote to the Plaintiff's attorney on the Plaintiff's behalf.  [T. 288]. He explained that the Plaintiff's primary problem was his weight, which made it likely that he would continue to experience low back pain.  Id.  Dr. Leppink was of the opinion that the Plaintiff would continue to need to miss a significant amount of work. Id.   Dr. Leppink also expressed his opinion that his current assessment of the

Plaintiff's condition related back to the Plaintiff's alleged disability onset date of May 31, 2002.  <u>Id.</u>

B.  <u>Hearing Testimony</u>.  The Hearing on August 26, 2003, commenced with some opening remarks from the ALJ.  [T. 304-05].  The Plaintiff's attorney did not object to any of the evidence in the Record, and did not have any additional documents to add to the Record.  [T. 305].  After the Plaintiff's attorney delivered an opening statement, the ALJ began questioning the Plaintiff.  [T. 305-16].

The Plaintiff testified that he was married and lived with his wife.  [T. 305].  He earned a G.E.D. while he was in the Marine Corps, where he received specialized training as an air fan, power plant, and jet mechanic.  [T. 305-06].  He has received no subsequent vocational training.  [T. 306].

The ALJ asked the Plaintiff why he thought he had been unable to work since May 31, 2002.  <u>Id.</u>  The Plaintiff explained that he "just can't function for a[n] eight-hour shift any longer."  <u>Id.</u>  He explained that he could have stayed on his job at 3M for "probably eight to nine months" after the plant closure, but he chose to take an earlier leave option because he "just couldn't handle" working any more.  <u>Id.</u>  The ALJ asked the Plaintiff if he had looked for any full-time work since that time.  <u>Id.</u>  The

- 10 -

Plaintiff replied that, while he had made several applications, he had not received any positive responses.  Id.

Next, the ALJ inquired into what the Plaintiff had been doing since he left work in May of 2002.  [T. 307].  The Plaintiff replied that he did very little, other than "sit around the house, take a little drive," and help his wife with some household chores. Id.  He explained that he could wash the dishes for 10-15 minutes at a time, but had to sit in a chair while he did so because he could not stand at the sink.  Id.  He was also able to vacuum, but had to sit between rooms to rest.  Id.  The ALJ asked the Plaintiff if he had been outside the State of Minnesota since May of 2002.  Id.  The Plaintiff admitted that he had gone on a fishing trip with a friend in the previous year. Id.  In addition, the Plaintiff had driven an elderly friend to cancer treatment twice a day for six (6) weeks.  [T. 308].  The ALJ also asked the Plaintiff about how often he visited with his grandson.  Id.  The Plaintiff explained that he did not get to see him very often, but when he did he would sit in a chair in order to play with him.  [T. 308-09].  The ALJ also asked the Plaintiff about his living situation. [T. 309].  The Plaintiff explained that he and his wife lived in a one-story, two bedroom house with no stairs. Id.  The Plaintiff does not maintain the yard, but pays to have that done.  Id.

The ALJ then asked the Plaintiff to describe his biggest physical problem.  [T. 310].  The Plaintiff replied that it was his back and his left leg, which goes numb if he walks on it for too long.  Id.  The Plaintiff described his back pain as starting in his lower back, and traveling down through his left leg to his left knee.  Id.  The ALJ asked what situations, or activities, produced pain in the Plaintiff's back and leg.  Id.  He replied that he has the pain "24/7."  Id.   The Plaintiff stated that, in order to alleviate the pain, he goes back to bed, pulls his foot over the edge of the bed, and tries to "stretch it out."  Id.  Taking a short walk, or sitting or lying down, also helped the Plaintiff manage his pain.  Id.  The Plaintiff reported taking pain relief medication, that provided him relief for one (1) to two (2) hours at a time.  Id.

The ALJ asked the Plaintiff about the possible causes of his back pain.  [T. 311].  The Plaintiff responded that he felt that his past injuries, as well as his weight, were contributing factors.  Id.  The Plaintiff reported his current weight at 407 pounds. Id.  The ALJ asked the Plaintiff if he was on any special diet to attempt to lose weight. Id.   The Plaintiff replied that he was trying to cut back on carbohydrates at his doctor's suggestion.  [T. 313].

The ALJ next inquired about the physical limitations that were being claimed by the Plaintiff.  Id.  The Plaintiff explained that the most comfortable position for him

was lying down in bed.  Id.   The next best position was sitting in a recliner with his leg sticking out, so he could rock and stretch his leg.  Id.  The Plaintiff also reported that days with high humidity aggravated his asthma, and made it difficult for him to breathe. [T. 313-14].  The Plaintiff testified that, in addition to his regular doctor, he had seen a surgeon who advised him that he could only perform an operation to improve his back if he weighed less than 250 pounds, but that goal seemed "lofty" to him.  [T. 314].

The ALJ inquired into  prospective treatments for the Plaintiff's condition.  [T. 315].  The Plaintiff explained that he had never had any injections or acupuncture for his back, nor had he used a TENS unit.[2]  Id.  He had not attended physical therapy since May of 2002.  Id.  The Plaintiff received worker's compensation for his back problem for approximately three (3) months while he was employed at 3M.  Id.  In response to the ALJ's inquiry, the Plaintiff reported that he was taking Motrin, Percocet,[3] and a medication for blood pressure.  [T. 316].

---

[2]TENS is an acronym for "transcutaneous electrical nerve stimulation."

[3]Percocet "is indicated for the relief of moderate to moderately severe pain." Physicians' Desk Reference, at 1304 (57th Ed. 2003).

The Plaintiff was then questioned by his attorney about work that he had applied for since he ended his employment with 3M in May of 2002.  Id.  The Plaintiff testified that he had applied for security jobs, even though they did not fit within his physical restrictions.  [T. 317].  He explained that, although he had applied for those jobs, he did not feel he would be able to perform them because they required an eight (8) hour working day, and more standing and bending to pick up boxes than he would be capable of performing.  Id.  The attorney asked the Plaintiff, "do you think you could work at a job for eight hours?"  Id.  The Plaintiff replied, "no," because "the pain gets too intense."  Id.  When asked by his attorney why he continued to apply for jobs that he knew he could not perform, the Plaintiff responded that he needed to work "to support my wife and my household, and I need something to do."  [T. 317-18].

The attorney then reviewed the Plaintiff's employment history.  [T. 318].  The Plaintiff started working at 3M shortly after his discharge from the Marines Corps in 1979, and he worked there full time until May of 2002.  Id.  However, he claimed that, by the time he stopped working at 3M, he was not able to work five (5) days a week, and stay for the full eight (8) hours.  Id.  The Plaintiff reported that, even before May of 2002, he was missing work due to his chronic low back pain.  [T. 318-19].  His attorney then focused the discussion on the time period from January 1, 2002, until the

end of May of 2002. [T. 319].  The Plaintiff explained that he was missing time from work, on a "monthly basis," during that period, at an estimated rate of "at least four to five days a month."   Id.

Next, the attorney asked the Plaintiff about the fishing trip he had mentioned to the ALJ earlier in the Hearing.  [T. 307, 319].  The Plaintiff explained that, during the trip, he could get in and out of the boat, and could sit and stand on the boat to stretch his back, but he could not help get the boat in and out of the water.  [T. 319-20].  Furthermore, he could only stay on the boat for approximately two (2) hours at a time, and then had to return to the cabin for bed rest. [T. 320].

Finally, the attorney asked the Plaintiff about the only job he has had since May of 2002.  Id.  The Plaintiff explained that he got a job at an ice rink through a friend who is the director of the community center where the rink is located.  [T. 321].  However, he found that he was not able to perform all of the duties of the job, such as getting the ice nets off the rink, vacuuming, and toilet cleaning.  Id.  The Plaintiff admitted that he paid kids who were hanging out at the rink, in soda pop and candy bars, to perform those parts of his job for him.  Id.

The Medical Expert ("ME"), Dr. Robert Mulhausen, then briefly examined the Plaintiff.  Id.  The Medical Expert asked the Plaintiff if he had ever considered bypass

- 15 -

surgery for his stomach, in order to help him lose weight. [T. 322].  The Plaintiff

explained that he had attended a seminar on the topic, but that the idea frightened him,

and he had ruled it out.  Id.

The Vocational Expert ("VE"), Steven Basch, then asked the Plaintiff questions

about his work at the ice rink.  [T. 322-23].  In response to that questioning, the

Plaintiff explained that his work at the ice rink had been part-time and had lasted six

(6) to seven (7)weeks.  [T. 323].

The Hearing continued with the testimony of the ME, who listed the Plaintiff's

impairments.  [T. 323].  The ME testified that, in his opinion, the Plaintiff suffers from

very mild diabetes and hyperlipidemia, significant obesity and hypertension, with a

history of asthma and low back pain. [T. 323-24].  The ME found that the history of

back pain was consistent with the Listings,[4] [T. 324], but he noted that it was unusual

that there was no supporting evidence in the Record, such as x-rays or an MRI.  Id.

Furthermore, the ME noted that there were only two episodes in the Plaintiff's chart

that were specifically related to back pain, and very little information concerning the

---

[4]20 C.F.R. §404, Subpart P, Appendix 1, contains a Listing of Impairments that
identifies a number of different medical conditions, and describes a required level of
severity for each condition.  If the required severity is met, the claimant is found
disabled without considering vocational factors.

extent and type of examinations performed on the Plaintiff's back.  Id.  The ME reported that, beyond the RFC by the Plaintiff's physician, he did not find substantial evidence in the Record that would support a claim by the Plaintiff that he could not work.  Id.

The ALJ then asked the ME what kind of work he felt the Plaintiff was capable of performing.  [T. 325].  The ME responded that he would restrict the Plaintiff to sedentary work, with "substantial limitations," such as no significant ramp or stair climbing, minimal stooping, no kneeling, crouching, or crawling.  Id.  The Plaintiff would need a "sit/stand option," and would have to avoid wetness, humidity, fumes and gasses.  Id.  The Plaintiff would have to avoid hazards, machineries and heights, and would probably only be capable of limited reaching, "mostly overhead."  Id.

The attorney then examined the ME. [T. 326].  On examination, the ME admitted that a person who was as overweight as the Plaintiff could expect to have some kinds of back problems, and increased fatigue on exertion.  Id.  In addition, he agreed that nothing in the Record indicated that the Plaintiff was fabricating his complaints.  [T. 327-38].

The ALJ then examined the VE and posed the following hypothetical:

> Assume we have an individual who, at onset, is 46 with GED education, work experience as outlined by yourself in 8E, who is on a number of medications with no apparent side effects, who is impaired with asthma, obesity, chronic back pain, mild diabetes, hypertension, and a status post-rate epicondilitis.  Who is limited to lifting and carrying 10 pounds frequently and 10 pounds occasionally.  Who can do work where there would be no exposure to temperature humidity extremes, smoke fumes or airborne irritants, where there would be no heights, ladders, scaffolding, and only occasional over shoulder reaching.  There would be no kneeling, crouching, or crawling.  And only minimal stooping, bending, twisting, or climbing, and I'm defining minimally as up to one-sixth of the time.  Who could be on his feet a maximum of two hours out of an eight-hour day with a sit stand option.

[T. 328].

The ALJ asked if a person with those limitations could perform any of the work that the Plaintiff previously had done.  Id.  The VE responded in the negative, explaining that the Plaintiff's "past work would not be possible."  [T. 329].  The ALJ then asked, if there would be any work in the regional or national economy for such a person.  Id.  The VE suggested that there were positions that such a person could perform, such as any sorting occupation, as a security monitor, cashiering work, and some assembly or production-type work.  Id.  Each of those positions is sedentary or light work and unskilled.  Id.

The ALJ then restated his initial hypothetical as follows:

- 18 -

> Assume a similar individual; however, this time they're limited to sedentary work. Again ability to be on their feet a maximum of--less than two hours out of an eight-hour day. Ability to sit about three hours a day, sitting no more than ten minutes at any one time. Standing no more than ten minutes at any one time. Walking around no more than at least every 20 minutes where they would have a sit/stand option at will. That the individual would have to lie down three or four times a day. That the individual could never climb ladders and only occasionally climb stairs and twist and stoop and crouch very little. Very little being defined as less than minimally, which has been defined as one-sixth. Would have difficulty reaching and pushing and pulling. Would have to avoid humidity and dampness and would be unable to get off the floor if, for any reason, the job tasks required him to be on the floor. And would miss approximately five days a month.

[T. 330].

The ALJ asked if there would be any work in the regional or national economy for someone with the limitations he had described. Id. The VE said that there would not. Id.

The attorney then examined the VE, and asked him to add onto the ALJ's original hypothetical the limitation that the individual was unable to complete an eight-hour workday. [T. 330-31]. The VE admitted that this addition would eliminate the possibility of competitive employment for the individual. [T. 331]. The attorney then asked him to add to the ALJ's original hypothetical the limitation that the individual

would miss work more than three times a month due to back pain.  Id.  The VE

admitted that this would also eliminate the possibility of competitive employment for

the individual.  Id.

The attorney then asked the VE to explain how he arrived at the number of jobs

available in the regional market for surveillance system monitor, cashier, and sorter.

Id.  The VE acknowledged that those occupations were not listed as such in the

Minnesota Occupational Outlook, but he explained that he had extrapolated from

related listings, and had drawn on his professional experience, and from conversations

he had with people at the Department of Economy Security.  [T. 332-33].  On the

basis of the VE's answers, the attorney objected to the VE's response to the ALJ's

first hypothetical, in which he suggested that jobs existed in the regional and national

economy that the Plaintiff was capable of performing.  [T. 334].  The ALJ overruled

the objection.  Id.

C.  The ALJ's Decision.  The ALJ issued his decision on January 28, 2005.

[T. 10-24].  As he was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by 20 C.F.R. §§404.1520.[5]  As a threshold matter,

---

[5]Under the five-step sequential process, the ALJ analyzes the evidence as
follows:

- 20 -

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 31, 2002.  [T. 16].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the

---

(1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

- 21 -

Hearings, the ALJ found that the Plaintiff was severely impaired by his chronic low back pain, asthma, right elbow epicondylitis, and marked exogenous obesity.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Testimony of the ME, and the Record.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  [T. 16].  The term RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler,

739 F.2d 1320 (8ᵗʰ Cir. 1984), <u>Social Security Ruling 96-7p</u>, and <u>Title 20 C.F.R. §404.1529</u>.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the reports of Dr. Leppink; the impartial ME; the objective medical evidence; the State Agency consultants;  and the Plaintiff's subjective complaints of pain, the ALJ determined the Plaintiff's RFC, as of September 19, 2003, to be as follows:

> [The Plaintiff] lacks the residual functional capacity to do sustained work-related physical and mental activities in a work setting on a "regular and continuing basis."

[T. 19].

The ALJ further determined that the Plaintiff's RFC for the remaining period at issue -- that is, from the Plaintiff's alleged onset date of May 31, 2002, through September 18, 2003 -- was as follows:

> [The Plaintiff] retained the residual functional capacity to engage in a modified range of sedentary work activity, work involving occasional lifting of up to 10 pounds; which involved sitting for a total of 6 out of 8 hours and standing/walking for a total of 2 out of 8 hours during the course of a workday, provided such work allowed for a sit/stand option at will; no exposure to temperature extremes or high humidity; no work performed at unprotected heights, or which involved the climbing of ladders or scaffolds; only occasional reaching overhead; no

- 23 -

> kneeling or crawling and only minimal stooping and crouching; and the [Plaintiff] was limited to work in a clean air environment, without exposure to smoke, fumes, dust or chemical irritants.

[T. 19].

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he had been disabled, by his impairments, from all work activity since May 31, 2002.  Id.

The ALJ also determined that the Plaintiff's complaints of disabling back pain were inconsistent with the Record.  Id.  The ALJ began by noting that the ME testified that he felt the medical record did not document any long-term back problems.  Id.  Further, while Dr. Leppink opined in his letter of October 27, 2004, that the limitations he had set forth in his assessment of September 19, 2003, would have been appropriate for the time subsequent to May 31, 2002, only two and one-half (2½) months earlier, he had advised, in a "Workers' Compensation Initial Injury Report/Physician Report to Employer," that the Plaintiff would be able to return to work without restrictions as of March 15, 2002.  [T. 20].

Further, in July of 2003, Dr. Leppink included the notes from an examination of the Plaintiff, that he had ceased to do any activity at all, and added: "Partly I think his idea that he's disabled and is unable to do any activity though he was a multitude more

- 24 -

active with his job and even some activity would have been reasonable for him." Id. Following an examination in October of 2002, Dr. Leppink reported that the Plaintiff's back, neurological, and musculoskeletal systems, as well as his extremities, were "all within normal limits." Id. The ALJ also explained his decision by pointing out that, prior to September 19, 2003, the Plaintiff's course of treatment consisted primarily of conservative modalities, with no surgery, injections, or physical therapy, and that relief was afforded by lying down and taking pain medication when needed. Id. The ALJ found nothing in the Record to indicate that, prior to September 19, 2003, the Plaintiff had to lie down at unpredictable intervals during the course of the day. Id.

In addition, there was no indication that there was any significant change in the Plaintiff's condition prior to September 19, 2003, and indeed, he continued to apply for full-time jobs after he stopped working in May of 2002. Id. The ALJ found that the variety of physical activities, which the Plaintiff admitted to performing prior to September 19, 2003, "are at least equal to, if not greater than, the exertional demands for a modified range of sedentary work activity" that he found by his RFC. Id. Finally, addressing the numerous absences in the Plaintiff's attendance record with his former employer 3M, in 2001 and 2002, the ALJ noted that there was nothing in the

medical records to indicate that the Plaintiff's absences were the result of his impairment.  [T. 20-21].

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis that, as of September 19, 2003, the Plaintiff could no longer perform his past relevant work, since that work was performed at the "light" exertional level, and therefore, would involve more physical exertion than he would be capable of tolerating. [T. 21-22].

Accordingly, the ALJ noted that the final step was to determine whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  [T. 22] The ALJ expressly noted that the burden of proof shifts, at this Step, to the Commissioner.  [T. 19].  At Step Five, the ALJ reported the findings of the VE that, prior to September 19, 2003, the Plaintiff was capable of performing a variety of unskilled, sedentary jobs, such as sorter, security monitor, optical assembler, and cashier.  Id.  As a result, the ALJ found that full-time jobs within the Plaintiff's limited RFC, as it existed in the period prior to September 19, 2003, existed in significant numbers in the national economy.  Id.

- 26 -

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time prior to September 19, 2003.  Id.  However, the ALJ found that the Plaintiff was disabled beginning on September 19, 2003, as, since that time, he has lacked the RFC to engage in full-time, competitive employment on a consistent and sustained basis.  Id.  Thus, the ALJ found that the Plaintiff was entitled to a period of disability, or DIB, for a period commencing on September 19, 2003. Id.  Finally, the ALJ noted that the above decision had been made after careful consideration of the opinions of the State Agency medical consultants, who evaluated the claimant's disability claim at the initial and reconsideration levels, citing 20 C.F.R. 404.1527(f) and Social Security Ruling 96-6p).  Id.

IV.  Discussion

A.    Standard of Review.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's

decision.  See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>Moore ex rel. Moore v. Barnhart</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence

supports the decision." <u>Banks v. Massanari</u>, 258 F.3d 820, 822 (8th Cir. 2001).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions

from the evidence and one of those positions represents the Commissioner's findings,

we must affirm the denial of benefits.'" <u>Vandenboom v. Barnhart</u>, 412 F.3d 924, 927

(8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004);

<u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the

Commissioner even if this Court, sitting as the finder-of-fact, would have reached a

contrary result.  See, <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995); <u>Woolf v.</u>

<u>Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of

drawing two inconsistent conclusions, and therefore, embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being

subject to reversal on appeal.  See, <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir.

1994); see also, <u>Haley v. Massanari</u>, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as

there is substantial evidence in the record to support the Commissioner's decision, we

will not reverse it simply because substantial evidence exists in the record that would

have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir.

1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v.</u>
<u>Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual
determinations, therefore, is deferential, and we neither reweigh the evidence, nor
review the factual record <u>de</u> <u>novo</u>.   See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445
(8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92
F.3d 672, 675 (8th Cir. 1996).

      B.   <u>Legal Analysis</u>. In support of his Motion for Summary Judgment, the only
issue raised by the Plaintiff pertains to his eligibility for benefits during the period from
May 31, 2002, through September 18, 2003.   See, <u>Plaintiff's Memorandum</u>, at p. 6
("The only issue Johnson is raising in the present appeal pertains to his eligibility for
benefits during the period from May 31, 2002 through September 18, 2003.").   The
Plaintiff argues that the overwhelming weight of evidence shows that he was disabled
as of May 31, 2002.   First, he argues that the fact that his last day of work was May
31, 2002, is a strong indicator that that date  corresponds to the onset of his disability.
<u>Id.</u>   Next, the Plaintiff points out that, prior to May 31, 2002, Dr. Leppink had
informed the Plaintiff's employer that, due to his condition, the Plaintiff could be
expected to miss as many as five days of work a month.   <u>Id.</u> at 6-7.   According to the
Plaintiff, Dr. Leppink's prediction was borne out by the Plaintiff's actual attendance

- 30 -

records with his former employer, which show that he was missing several days of work a month prior to May 31, 2002. Id. at 7. Finally, the Plaintiff notes that, in his letter of October 27, 2004, [T. 288], Dr. Leppink concluded that the restrictions, upon which the ALJ based his findings of disability after September 19, 2003, would have been appropriate at all times subsequent to May 31, 2002. Id.

As here pertinent, Social Security Ruling 83-20 sets out the factors to be considered when establishing an onset date of disability. See, Social Security Ruling 83-20. "In determining the date of onset of a disability, the ALJ should consider the claimant's alleged date of onset, his work history, and the medical and other evidence of his condition." Id. at *1; see also, Karlix v. Barnhart, 2006 WL 2165728 at *3 (August 3, 2006, 8th Cir.), citing Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997). "The date alleged by the individual should be used if it is consistent with all the evidence available." Social Security Ruling 83-20, supra at *1. However, the Plaintiff's allegation as to the date of the Plaintiff's work stoppage is significant, in determining the onset date, only if it is consistent with the severity of the condition(s) shown by the medical evidence. Id.

We find that the ALJ had substantial evidence in the Record on the whole to find that the Plaintiff was not disabled for the period between his claimed onset date

of May 31, 2002, and September 19, 2003, which is the date that the ALJ determined was the onset of the Plaintiff's disability.  Of course, we understand the Plaintiff to argue that, "[a]s Johnson's treating physician, Dr. Leppink's opinion is entitled to great weight," and since Dr. Leppink expressed the conclusion that the Plaintiff was disabled from May 31, 2002, the ALJ should have acceded to that conclusion. Plaintiff's Memorandum, at p. 7.  We have no quarrel with that well-settled principle that, where, as here, a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.  20 C.F.R. §§404.1527; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical

opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, supra at 1328; Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. Id. As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

Here, in his careful examination of the Record, the ALJ correctly noted that nothing in Dr. Leppink's objective medical findings, prior to September 19, 2003,

- 33 -

revealed any significant change in the Plaintiff's physical condition. [T. 20]. In particular, the ALJ considered a key inconsistency in Dr. Leppink's evaluation of the Plaintiff's abilities. While Dr. Leppink suggested that his assessment of the Plaintiff, on September 19, 2003, supported a finding of disability, and would have been applicable after May 31, 2002 – the Plaintiff's claimed onset date -- only two and one-half (2½) months prior to that date, Dr. Leppink completed a workers' compensation form for the Plaintiff in which he reported that the Plaintiff would be able to return to work, without restrictions, as of March 15, 2002. [T. 288, 190].

Moreover, following his examination of the Plaintiff on October 28, 2002, Dr. Leppink reported that the Plaintiff's back, neurological, and muscoloskeletal systems, as well as his extremities, were all within normal limits. [T. 236]. Indeed, the ALJ noted the lack of objective findings, in the medical record submitted by the Plaintiff, to support the Plaintiff's assertion of total disability. [T. 20]. In our considered judgment, Dr. Leppink's retrospective opinion, expressed solely in conclusory terms, was afforded the weight that it deserved. See, Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), citing Bentley v. Shalala, 52 F.3d 784, 785-87 (8th Cir. 1995); Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001), citing Jenkins v.

Chater, 76 F.3d 231, 233 (8ᵗʰ Cir. 1996).  Here, the ALJ properly consulted with an

ME, and was persuaded by the ME's assessment of the Record, as independently

corroborated by the ALJ.  See, Grebenick v. Chater, supra at p. 1200-01, citing Social

Security Ruling 83-20, and DeLorme v. Sullivan, 924 F.2d 841, 848 (9ᵗʰ Cir.

1991)(concluding that, if the medical evidence concerning an onset date is ambiguous,

reviewing Courts require the ALJ to secure an expert opinion from a medical expert);

see also, Karlix v. Barnhart, --- F.3d ---, 2006 WL 2165728 at *3 (8ᵗʰ Cir., August 3,

2006)(same).  We find no basis, on this Record, to disturb the ALJ's resolution of the

medical conflicts in this Record.

Further, the ALJ correctly observed that, for the period prior to September 19,

2003, the Plaintiff's medical treatment involved only conservative modalities, without

resort to surgery, injections, or physical therapy.  Rather, the Plaintiff managed his pain

through rest, some prescribed medications, and stretching exercises.  Indeed, the

Plaintiff's treating sources addressed surgical means to treat the Plaintiff's back pain,

by substantially reducing his weight, but the Plaintiff rejected any such approach, and

appeared to resign himself to a deconditioned state.  In this respect, we note that, "[i]f

an impairment can be controlled by treatment or medication, it cannot be considered

disabling."  Roth v. Shalala, 45 F.3d 279, 282 (8ᵗʰ Cir. 1995) citing Stout v. Shalala,

988 F.2d 853, 855 (8th Cir. 1993)(holding that a claimant who was able to control his chronic headaches with over-the-counter and prescription medications was not disabled). Our Court of Appeals has held that, in order to determine the date of onset, an ALJ may properly take into account the fact that a claimant failed to make significant efforts to seek medical treatment. Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). Here, the ALJ found evidence in the Record that the Plaintiff's leg and back pain was sufficiently controlled by stretching and over-the-counter and prescribed pain medication. [T. 20.] In addition, the ALJ concluded that the evidence suggested that the Plaintiff "has not always been fully compliant with respect to performing his prescribed exercises," which could contribute to any deterioration in his condition, and the ALJ found nothing to suggest that the Plaintiff had been more aggressive about seeking treatment for his alleged disabilities at any time prior to September 19, 2003. Id. The ALJ's analysis of these factors was entirely appropriate.

In addition, the ALJ properly considered the Plaintiff's own testimony, which reflected that he remained active after May 31, 2002, by washing dishes, voluntarily driving a friend to cancer treatment, grocery shopping, and going on a fishing trip about one year prior to the Hearing. [T. 20, referencing T. 307-08]. The ALJ determined, we think correctly, that those activities were at least equal to, if not greater

- 36 -

than, the exertional demands for the modified range of sedentary work activity that the ALJ found appropriate here.  [T. 20].

Nor did the ALJ overlook the Plaintiff's numerous absences from work, prior to May 31, 2002, but the ALJ could find little correlation between those absences and a claim of incapacitating back pain.  Some of the absences were due to other, transient maladies, and others were due to traumatic exacerbations to the Plaintiff's low back. The ALJ concluded "that there was nothing in the medical records to suggest that the claimant's absences were the result of his impairments and required treatment," [T. 21], and the Plaintiff offers no particularized showing that that conclusion was without the support of substantial evidence, nor does our independent review reveal any responsible basis to reverse the ALJ's decision on that basis.  [T. 21, referencing T. 173-229].

In sum, finding no error in the Record before us that warrants a reversal, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Cross-Motion be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 14] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 17] for Summary Judgment be granted.


Dated: August 28, 2006                          s/Raymond L. Erickson

                                                Raymond L. Erickson
                                                CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **September 15, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **September 15, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.